UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

**Docket No.:**  23-cv-2269

----------------------------------------------------------X

JACQUELINE WADE,

                            Plaintiff,

                -against-

JEWISH COMMUNITY COUNCIL OF
GREATER CONEY ISLAND, CONCRETE
SAFARIS, INC., DENISE SOSA, *In Her Individual
and Official Capacities,* BRUNO MAYO,
*In His Individual and Official Capacities*,
KEMAR GREEN, *In His Individual and
Official Capacities, and* MAC LEVINE*, In Her
Individual and Official Capacities.*

                        Defendants.

**COMPLAINT**


**PLAINTIFF DEMANDS
A TRIAL BY JURY**

----------------------------------------------------------X

       PLAINTIFF JACQUELINE WADE ("PLAINTIFF") by her attorneys PHILLIPS &

ASSOCIATES, hereby complains of the Defendants, upon information and belief, as follows:

**NATURE OF THE CASE**

1.    PLAINTIFF complains pursuant to <u>Title VII</u> of the <u>Civil Rights Act of 1964</u>, <u>42 U.S.C</u>. §

    2000e *et seq*. ("<u>Title VII</u>"), the <u>Americans with Disabilities Act of 1990</u>, <u>42 U.S.C</u>. §§

    12101, *et seq*. ("<u>ADA</u>"), the <u>New York State Human Rights Law</u>, <u>New York State</u>

    <u>Executive Law</u> § 296 *et seq.* ("<u>NYSHRL</u>"), and the <u>New York City Human Rights Law</u>,

    <u>New York City Administrative Code</u> § 8-502(a) *et seq*. ("<u>NYCHRL</u>"), and seeks damages

    to redress the injuries PLAINTIFF suffered as a result of being **discriminated against** on

    the basis of her **sex/gender (female)** and unlawfully **retaliated against** (including physical

    abuse and retaliation causing serious physical injuries) for engaging in protected activity.

2.    At all times relevant, PLAINTIFF worked as a "City Clean Up Corp" at/with

    DEFENDANT JEWISH COMMUNITY COUNCIL OF GREATER CONEY ISLAND

("JCCGCI") and DEFENDANT CONCRETE SAFARIS.

3.     During PLAINTIFF'S employment, PLAINTIFF was subjected to ongoing and continuous sex/gender-based discrimination by her manager DEFENDANT BRUNO MAYO. Specifically, PLAINTIFF and other female employees who reported to DEFENDANT BRUNO MAYO were not allowed to do certain yard duties because DEFENDANT BRUNO MAYO said they were *"manly jobs,"* and he instead relegated PLAINTIFF and her female co-workers to menial, undesirable jobs, such as picking up trash, raking leaves, and sweeping, which BRUNO MAYO deemed more suitable for women.

4.     When PLAINTIFF complained to DEFENDANT BRUNO MAYO'S supervisor, DEFENDANT KEMAR GREEN, that DEFENDANT BRUNO MAYO was discriminating against females, DEFENDANT BRUNO retaliated against PLAINTIFF by immediately assigning PLAINTIFF dangerous and abusive job assignments, while directly supervising PLAINTIFF to make sure he could punish her for complaining.

5.     Unfortunately, DEFENDANT BRUNO MAYO'S intentionally abusive job assignments caused PLAINTIFF to suffer physical injuries and become diagnosed with "total orthopedic disability," soon thereafter.

6.     PLAINTIFF knew that DEFENDANT BRUNO MAYO gave PLAINTIFF strenuously dangerous work in retaliation for her complaints of gender discrimination and reported DEFENDANT MAYO again, this time copying all the managers/supervisors of DEFENDANTS JCCGCI and CONCRETE SAFARIS.

7.     To PLAINTIFF'S shock and dismay, case manager DEFENDANT DENISE SOSA blamed PLAINTIFF for getting injured and informed PLAINTIFF that DEFENDANT *"CONCRETE SAFARIS no longer wishes [PLAINTIFF] to return."* PLAINTIFF was wrongfully terminated for engaging in protected activity.

8.    As a result of the above-alleged acts of DEFENDANTS, which will be outlined in detail below, PLAINTIFF asserts that she was discriminated against based on her sex/gender (female) and retaliated against for engaging in protected activity.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

9.    Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and 1343.

10.    The Court has supplemental jurisdiction over Plaintiff's claims brought under state and city law pursuant to 28 U.S.C. § 1367.

11.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), as the acts complained of occurred therein.

12.    By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 30, 2022; (b) receiving a Notice of Right to Sue from the EEOC on January 3, 2023; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing a copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of section 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

## PARTIES

13.    **PLAINTIFF JACQUELINE WADE (hereinafter "PLAINTIFF")** is a female, who resides in New York, New York. PLAINTIFF was employed at JEWISH COMMUNITY COUNSIL OF GREATER CONEY ISLAND as a "City Clean Up Corp."

14.    **DEFENDANT JEWISH COMMUNITY COUNCIL OF GREATER CONEY ISLAND (hereinafter "DEFENDANT JCCGCI")** is a not-for-profit 501(c)(3) organization that is authorized to do business in New York, with its headquarters located at 3001 W 37th Street, Brooklyn, New York 11224. Upon information and belief, DEFENDANT JCCGCI is an organization that provides human and social services to communities within New York City, and clean-up support to other community-based organizations within New York City.

15.    Upon information and belief, DEFENDANT JCCGCI employs fifteen or more employees.

16.    **DEFENDANT DENISE SOSA ("DEFENDANT SOSA")** is a case manager at DEFENDANT JCCGCI and has the authority to hire, fire, or affect the terms and conditions of PLAINTIFF'S employment, or to otherwise influence the decision-maker of the same. DEFENDANT SOSA is being sued herein in her individual and official capacities.

17.    **DEFENDANT BRUNO MAYO ("DEFENDANT MAYO")** is a manager and/or supervisor at DEFENDANT JCCGCI and/or CONCRETE SAFARI and has the authority to hire, fire, or affect the terms and conditions of PLAINTIFF'S employment, or to otherwise influence the decision-maker of the same. DEFENDANT MAYO is being sued herein in his individual and official capacities.

18.    **DEFENDANT KEMAR GREEN ("DEFENDANT GREEN")** is a manager and/or supervisor at DEFENDANT JCCGCI and has the authority to hire, fire, or affect the terms

and conditions of PLAINTIFF'S employment, or to otherwise influence the decision-maker of same. DEFENDANT GREEN is being sued herein in his individual and official capacities.

19.    **DEFENDANT CONCRETE SAFARIS, INC., (hereinafter "CONCRETE SAFARIS")** is a foreign non-for-profit corporation that is authorized to do business in New York, with its headquarters located at 158 East 115th St #144, New York, New York, 10029.

20.    **DEFENDANT MAC LEVINE ("DEFENDANT LEVINE")** is the owner and/or Executive Director of DEFENDANT CONCRETE SAFARIS and has the authority to hire, fire, or affect the terms and conditions of PLAINTIFF'S employment, or to otherwise influence the decision-maker of the same. DEFENDANT LEVINE is being sued herein in her individual and official capacities.

21.    DEFENDANT JCCGCI and CONCRETE SAFARIS, were joint employers of Plaintiff in that they share commonalities of hiring, firing, discipline, and supervision as to PLAINTIFF.

22.    Defendant CONCRETE SAFARIS controlled PLAINTIFF'S day to day assignments and duties and was in control of making major employment decisions, including termination of PLAINTIFF'S employment.

23.    By way of example, if PLAINTIFF was running late to work or would need a day off from work, PLAINTIFF would contact DEFENDANT CONCRETE SAFARIS.

24.    By way of further example, DEFENDANT CONCRETE SAFARIS had the authority to discipline PLAINTIFF.

25.    DEFENDANT JCCGCI paid Plaintiff.  If Plaintiff had any issues with payroll, Plaintiff would direct her concerns to DEFENDANT JCCGCI.

26. DEFENDANT JCCGCI'S agents knew that Plaintiff was subjected to unlawful discrimination and retaliation and Defendant JCCGCI failed to take immediate and appropriate corrective action.

27. DEFENDANT JCCGCI, DEFENDANT SOSA, DEFENDANT MAYO, DEFENDANT GREEN and DEFENDANT CONCRETE SAFARIS, shall hereinafter collectively be referred to as, "COLLECTIVE DEFENDANTS."

## MATERIAL FACTS

28. On or about November 1, 2022, PLAINTIFF began working for DEFENDANT JCCGCI as a "City Clean Up Corp."

29. Upon her hire, DEFENDANT JCCGCI immediately placed PLAINTIFF at DEFENDANT CONCRETE SAFARIS, where she worked as a "City Clean Up Corp", and was tasked to do gardening, planting, raking, watering, sweeping, mulching, building and various other duties.

30. PLAINTIFF worked full-time earning 20/hr. and worked 40 hours per week. PLAINTIFF would have earned an annual salary of approximately $41,600 for the year 2022.

31. PLAINTIFF enjoyed going to work each day and took much pride in her work. PLAINTIFF'S joy working for DEFENDANT CONCRETE SAFARIS, however, was short-lived.

32. In or about December 2021, PLAINTIFF began reporting to a new supervisor, DEFENDANT MAYO, who immediately subjected PLAINTIFF to discriminatory treatment due to her gender, and/or because she is a female.

33. By way of example, DEFENDANT MAYO simultaneously and instantaneously took several of PLAINTIFF'S, and her other female co-workers', job duties away, including building walls, gardening, watering, and planting.

34.  According to DEFENDANT MAYO, these were, in no uncertain terms, ***"manly jobs,"*** which needed to be assigned to, and handled by, male employees.

35.  As a result, PLAINTIFF and her female co-workers were relegated to very mundane, uncreative, and undesirable jobs, such as raking the leaves, picking up trash, sweeping, and mulching.

36.  To DEFENDANT MAYO, these jobs (*i.e.* mostly cleaning and clean up duties) were the only types of jobs that the female employees should be doing, and were the only types of jobs assigned to female employees once MAYO became the supervisor.

37.  PLAINTIFF understood this treatment to be discrimination because other supervisors let their female workers perform the same work as their similarly situated male co-workers.

38.  As a manager/supervisor, DEFENDANT MAYO knew or should have known that his conduct and beliefs were discriminatory and improper for the workplace.

39.  Though he is a manager/supervisor with responsibilities over subordinates, DEFENDANT CONCRETE SAFARIS did not train, instruct and/or supervise DEFENDANT MAYO with respect to workplace discrimination laws.

40.  Feeling helpless, PLAINTIFF spoke to Anthony Chaney ("Mr. Chaney"), another supervisor and Garden Educator at DEFENDANT CONCRETE SAFARIS, for advice about her unfair working situation.

41.  Mr. Chaney told PLAINTIFF to ask DEFENDANT MAYO to let her do more.

42.  Following Mr. Chaney's advice, PLAINTIFF asked DEFENDANT MAYO on several occasions to join her similarly situated male co-workers on job assignments they were given, but DEFENDANT MAYO refused PLAINTIFF each time.

43.  Feeling defeated, PLAINTIFF complained DEFENDANT LEVINE, the owner of DEFENDANT CONCRETE SAFARIS, about the unfair working conditions.

*44.*   But, to PLAINTIFF'S surprise, DEFENDANT LEVINE dismissed PLAINTIFF and told PLAINTIFF that it was, **"*not [Levine's] problem.*"**

45.   DEFENDANT LEVINE was not trained, instructed and/or supervised by DEFENDANT CONCRETE SAFARIS with respect to workplace discrimination laws and was clear that she was not concerned about discrimination at CONCRETE SAFARIS.

46.   DEFENDANT CONCRETE SAFARIS must not have an antidiscrimination protocol or policy in place as managers were routinely allowed to discriminate against female employees (such as PLAINTIFF) with impunity.

47.   DEFENDANT CONCRETE SAFARIS must not have an antidiscrimination protocol or policy in place as discrimination was allowed by management at the very top of the chain of command, down to the lower levels.

48.   PLAINTIFF decided she had no choice but to contact DEFENDANT SOSA, the case manager at DEFENDANT JCCGCI, for help.

49.   However, to PLAINTIFF'S shock and disappointment, DEFENDANT SOSA offered PLAINTIFF no support or advice regarding the same.

50.   PLAINTIFF was shocked because JCCGCI DEFENDANTS made PLAINTIFF undergo sexual harassment and discrimination training and assured PLAINTIFF that JCCGCI had a zero-tolerance policy for discrimination in the workplace.

51.   It was now clear to PLAINTIFF that JCCGCI DEFENDANTS' training was nothing more than a perfunctory "check-off-the-list" exercise, and their assurances that they have a "zero tolerance" policy for discrimination in the workplace, was not accurate.

52.   DEFENDANT SOSA knew or should have known that DEFENDANT MAYO treated PLAINTIFF discriminatorily and violated PLAINTIFF'S individual rights.

53. Instead of investigating PLAINTIFF'S complaints, or addressing same with CONCRETE SAFARI DEFENDANTS, DEFENDANT SOSA swept PLAINTIFF'S concerns under the rug and PLAINTIFF'S complaints were futile.

54. On or about January 12, 2022, DEFENDANT GREEN, a Senior Supervisor at JCCGCI, held a mandatory team meeting, which PLAINTIFF attended.

55. During the meeting, DEFENDANT GREEN shared that DEFENDANT MAYO had reported that, with the exception of one person, no one on DEFENDANT MAYO'S team was doing any work.

56. PLAINTIFF knew that DEFENDANT MAYO'S report was false and several of her co-workers spoke up immediately, telling DEFENDANT GREEN that DEFENDANT MAYO was lying.

57. Seeing that PLAINTIFF'S co-workers were speaking out against DEFENDANT MAYO, PLAINTIFF felt encouraged to speak up and told DEFENDANT GREEN that DEFENDANT MAYO was discriminating against the female workers.

58. PLAINTIFF explained to DEFENDANT GREEN that DEFENDANT MAYO would not allow her and her female co-workers to do certain jobs that DEFENDANT MAYO said were *"manly jobs"* and only allowed women to do menial work, such as raking, sweeping, and picking up trash.

59. PLAINTIFF indicated that DEFENDANT MAYO'S conduct was is discriminatory against the female employees.

60. Interestingly, DEFENDANT MAYO, who was also at the meeting and heard every word PLAINTIFF said, did not speak up to defend himself and did not deny anything that PLAINTIFF said.

61.    Meanwhile, to PLAINTIFF'S disappointment, DEFENDANT GREEN merely listened to PLAINTIFF'S complaints, occasionally commenting in sum or substance: *"I didn't know that."*

62.    DEFENDANT GREEN did not confront DEFENDANT MAYO at the meeting about PLAINTIFF complaints that DEFENDANT MAYO was discriminatorily assigning tasks to his workers based on their sex/gender.

63.    Upon information and belief, DEFENDANT GREEN also did not investigate PLAINTIFF'S complaint and took no remedial action against DEFENDANT MAYO to correct DEFENDANT MAYO'S discriminatory behavior after the meeting.

64.    DEFENDANT GREEN knew or should have known that DEFENDANT MAYO'S actions were unlawful and violated PLAINTIFF'S (as well as the other female employees') rights.

65.    Furthermore, when PLAINTIFF accepted her assignment at DEFENDANT CONCRETE SAFARIS, PLAINTIFF was advised to speak to DEFENDANT MAYO (or any similarly-situated supervisor) regarding any work issues.

66.    Yet at this point, PLAINTIFF had complained to all three supervisors and not one person did anything to address PLAINTIFF'S concerns.

67.    Nevertheless, PLAINTIFF thought that DEFENDANT MAYO recognized her complaints and had a change of heart because, a few days later, on or about January 18, 2022, DEFENDANT MAYO suddenly assigned PLAINTIFF to work with the male employees, or so PLAINTIFF thought.

68.    PLAINTIFF was unaware that, in retaliation for her complaint about gender discrimination, DEFENDANT MAYO planned to single-out PLAINTIFF, pull PLAINTIFF from the female group, and subject PLAINTIFF to retaliatory abuse.

69.     As a direct result of PLAINTIFF'S discrimination complaint, DEFENDANT MAYO set-out to humiliate and abuse PLAINTIFF in direct response.

70.     Specifically, when PLAINTIFF arrived at her work location that morning, PLAINTIFF was ordered to help two male employees finish building a stone wall at 113 Street and 2nd Ave in New York City.

71.     PLAINTIFF worked on the stone wall without issue as she and her male co-workers took turns mixing the cement and placing the bricks down into place.

72.     Thereafter, DEFENDANT MAYO decided to escalate the physically strenuous tasks assigned to PLAINTIFF.

73.     Specifically, that afternoon DEFENDANT MAYO ordered PLAINTIFF to load stone bricks into a wheelbarrow and drop the stones off at another location.

74.     In response, PLAINTIFF asked, *"Just me?"*

75.     DEFENDANT MAYO ignored PLAINTIFF'S question and told PLAINTIFF to follow him.

76.     DEFENDANT MAYO took PLAINTIFF to 115 Street where the stone bricks were located and instructed PLAINTIFF *"to get to work."*

77.     To PLAINTIFF'S surprise, only DEFENDANT MAYO worked with PLAINTIFF to load the stone bricks into the wheelbarrow. Then, the two had to carry the stones in the wheelbarrow for two blocks to their drop off location.

78.     PLAINTIFF was surprised because ten very heavy stone bricks were loaded into a wheelbarrow at a time, weighing hundreds of pounds, not including the wheelbarrow. Due to the weight of the stones and the challenging task to carry the heavy load two blocks up the road by wheelbarrow, this job is usually done with the help of several team members.

79.    DEFENDANT MAYO, however, provided  minimal help to PLAINTIFF. Specifically, PLAINTIFF pushed the wheelbarrow by herself most of the way.

80.    Meanwhile, DEFENDANT MAYO watched and followed PLAINTIFF with the intent to "teach PLAINTIFF a lesson" and to abuse PLAINTIFF for complaining about gender discrimination.

81.    If PLAINTIFF put down the wheelbarrow, or dropped same due to its extremely heavy weight, DEFENDANT MAYO would yell at PLAINTIFF to ***"keep going."***

82.    If PLAINTIFF was not moving fast enough (as she was obviously struggling), DEFENDANT MAYO would occasionally help PLAINTIFF.

83.    Unsurprisingly, however, DEFENDANT MAYO made PLAINTIFF do the majority of the work.

84.    As a result, PLAINTIFF was visibly struggling during the assignment and DEFENDANT MAYO found same amusing.

85.    By way of an example, when PLAINTIFF loaded her first wheelbarrow of stone bricks and carried it down the road, a few minutes into the trip, the wheelbarrow tipped over and all the stone bricks fell onto the ground.

86.    PLAINTIFF twisted her arm and shoulder as a result and the fact that she was struggling with the heavy load was apparent.

87.    Appearing completely unconcerned, DEFENDANT MAYO ordered PLAINTIFF in sum and substance, and in drill-instructor fashion, ***"You pick it up."***

88.    The stones were mixed in a pile of rubbish, shattered glass, and other sharp and dangerous substances that were on the ground at that location.

89.    Nevertheless, DEFENDANT MAYO watched-on callously and offered PLAINTIFF little assistance in picking up or retrieving the stone-bricks. Indeed, DEFENDANT MAYO only

picked up two stones and left PLAINTIFF to pick up the rest.

90.     PLAINTIFF struggled to pick up some of the stone bricks as some of them were mixed in the rubbish and PLAINTIFF knew she needed help if she was going to get all the stones back into the wheelbarrow.

91.     Nevertheless, DEFENDANT MAYO stood by and refused to help PLAINTIFF. DEFENDANT MAYO appeared to be getting (cruel) satisfaction by watching PLAINTIFF physically struggle with the assignment.

92.     Thankfully, Mr. Chaney was close by, and PLAINTIFF was forced to call him over to help.

93.     When Mr. Chaney came over, he immediately noticed that there was something wrong with the wheelbarrow. He observed that it was "broken" and "too dangerous to use", and instructed PLAINTIFF not to use it any further.

94.     Mr. Chaney then left and came back with an assistant, an intern named "Franco," to try to help make the necessary repairs to the wheelbarrow.

95.     However, DEFENDANT MAYO stepped in and told Mr. Chaney that he did not want Chaney to fix the wheelbarrow because it "would (allegedly) take too long," and that PLAINTIFF and DEFENDANT MAYO "had work to do."

96.     Mr. Chaney specifically told DEFENDANT MAYO that *"it would be dangerous"* for PLAINTIFF and DEFENDANT MAYO to continue to use the wheelbarrow.

97.     PLAINTIFF also expressed her concern about using the defective wheelbarrow, but DEFENDANT MAYO was uncaring.

98.     DEFENDANT MAYO unreasonably told both of them that PLAINTIFF and DEFENDANT MAYO was going to use the broken wheelbarrow and walked off.

99.     Upon information and belief, DEFENDANT MAYO ordered PLAINTIFF to continue using the broken wheelbarrow despite having knowledge that there were operable

wheelbarrows in the shed that they could use.

100.    DEFENDANT MAYO'S conduct and instructions to PLAINTIFF was in direct retaliation for PLAINTIFF'S complaints about gender discrimination.

101.    But for PLAINTIFF'S earlier complaint against DEFENDANT MAYO, DEFENDANT MAYO would not have subjected PLAINTIFF to this physically abusive assignment.

102.    Indeed, no other female employee, who did not complain about gender discrimination, was subjected to the same abusive assignments.

103.    It was clear that DEFENDANT MAYO intended to teach PLAINTIFF a hard lesson for complaining about differential treatment.

104.    Feeling helpless, PLAINTIFF asked Mr. Chaney what she should do. Mr. Chaney told PLAINTIFF that he would fix the wheelbarrow later and just do what DEFENDANT MAYO says.

105.    After Mr. Chaney and Franko left, PLAINTIFF and DEFENDANT MAYO finished loading the stone bricks into the wheelbarrow.

106.    DEFENDANT MAYO pushed the wheelbarrow unto the curb and made PLAINTIFF push the wheelbarrow the rest of the way to the drop off site, by herself.

107.    DEFENDANT MAYO watched on as PLAINTIFF struggled to push the 600+ pound wheelbarrow for two more blocks down the street.

108.    Then, DEFENDANT MAYO forced PLAINTIFF to immediately return to the area where the stones were located and carry a wheelbarrow full of stones a second time.

109.    When PLAINTIFF completed the task, DEFENDANT MAYO forced PLAINTIFF to do it once again.

110.    The third and fourth times, however, DEFENDANT MAYO did not help PLAINTIFF at all and did not permit anyone to help PLAINTIFF.

111. Once PLAINTIFF was done with that job, and before PLAINTIFF could catch her breath, DEFENDANT MAYO had another back-breaking job for PLAINTIFF.

112. Specifically, DEFENDANT MAYO ordered PLAINTIFF to shovel and carry 8 full wheelbarrows of mulch to a drop off site located three and a half blocks away.

113. One full wheelbarrow of mulch weighed about 150-200 pounds and is normally transported by at least two people.

114. PLAINTIFF had to make her way up a hill/pile of mulch and started shoveling mulch from the large pile into the wheelbarrow.

115. At one point, PLAINTIFF slipped on the hill of mulch. While shoveling the mulch, PLAINTIFF began to feel pain in her shoulders, knee and back.

116. Then, PLAINTIFF was forced to lift the wheelbarrow filled with mulch, and push the wheelbarrow for about two and half blocks before she had to unload the mulch.

117. Completely disregarding PLAINTIFF'S exhausted disposition, DEFENDANT MAYO ordered PLAINTIFF to get the job done alone.

118. It was clear that DEFENDANT MAYO was over-working, hazing, and abusing PLAINTIFF for making a complaint about male employees being treated differently than female employees.

119. PLAINTIFF was forced to take eight trips and/or fill eight wheelbarrows with mulch to transport two blocks, without assistance from MAYO.

120. PLAINTIFF began to feel her heart pound within her chest. PLAINTIFF also felt pain in her knees, shoulders and hands and let DEFENDANT MAYO know that she was in pain. DEFENDANT BRUNO did not seem to care and appeared satisfied at PLAINTIFF'S despair.

121.   If MAYO actually believed that carrying stones and/or mulch was a mans job, here DEFENDANT MAYO did not even offer (female) PLAINTIFF assistance, in retaliation.

122.   Overwhelmed with exhaustion, PLAINTIFF told DEFENDANT MAYO that she needed help.

123.   In response, DEFENDANT MAYO told PLAINTIFF to have her co-worker, Sydney, help her.

124.   DEFENDANT MAYO, however, never let Sydney actually help PLAINTIFF with her load. DEFENDANT MAYO instructed Sydney to grab her own wheelbarrow, and load and carry mulch. As such, PLAINTIFF received no relief.

125.   It soon became absolutely clear to PLAINTIFF that DEFENDANT MAYO was retaliating against PLAINTIFF for complaining about discrimination.

126.   To make matters worse, DEFENDANT MAYO'S treatment of PLAINTIFF felt physically and mentally abusive to PLAINTIFF.

127.   PLAINTIFF, however, feared that if she complained about her work again, DEFENDANT MAYO would retaliate against her by subjecting PLAINTIFF to more grueling tasks, or worse, deem PLAINTIFF insubordinate and terminate her employment.

128.   PLAINTIFF believed complaining was not worth that risk since she needed her job. As such, PLAINTIFF did not complain on this occasion.

129.   DEFENDANT MAYO then ordered PLAINTIFF to make approximately <u>eight</u> more trips with the wheelbarrow by herself.

130.   By the end of the day, PLAINTIFF was completely out of breath and felt sore all over.

131.   In fact, PLAINTIFF felt something was terribly wrong with her knee because she began to feel excruciating pain in different parts of her body.

132.   Worried that she had suffered an injury, PLAINTIFF told DEFENDANT MAYO that she

needed to go to the doctor.

133.    Unconcerned, DEFENDANT MAYO told PLAINTIFF to ask Mr. Hartsfield if she could take some time off to see the doctor.

134.    Mr. Hartsfield ultimately granted PLAINTIFF'S request.

135.    Before PLAINTIFF left that day, a few of PLAINTIFF'S co-workers confided in her that they had observed DEFENDANT MAYO'S abusive treatment of PLAINTIFF.

136.    PLAINTIFF was advised that no one else was working at the level that DEFENDANT MAYO ordered PLAINTIFF to work that day and believed that DEFENDANT MAYO was making PLAINTIFF work harder than everyone else because PLAINTIFF complained to DEFENDANT GREEN that DEFENDANT MAYO was discriminating against female workers.

137.    It hurt PLAINTIFF to hear her co-workers confirm what she had already suspected to be true.

138.    It was especially hurtful, however, knowing that DEFENDANT MAYO purposely worked her so hard that he caused her to suffer an injury, in retaliation for her complaint.

139.    On or about January 20, 2022, PLAINTIFF saw her doctor, who took x-rays of her knee, and diagnosed PLAINTIFF with Anserine Bursitis.

140.    Anserine Bursitis ("Bursitis") is an inflammation of the bursa (or closed, fluid-filled sac that works as a cushion to reduce fiction between tissues of the knee) which puts too much pressure on the adjacent parts of the knee and causes a lot of pain and swelling.

141.    Notably, PLAINTIFF'S doctor opined that PLAINTIFF'S condition was caused and aggravated by the extreme heavy lifting. In other words, DEFENDANT MAYO'S retaliatory conduct directly caused PLAINTIFF'S physical injuries.

142.    As a result of PLAINTIFF'S injury, PLAINTIFF'S doctor instructed PLAINTIFF to rest her knee and not to return to work until February 1, 2022.

143.    In addition, because the inflammation in her knee was so bad, the doctor gave PLAINTIFF a referral to see an orthopedic surgery specialist.  When the doctor performed the MRI on PLAINTIFF, the doctor discovered other injuries that PLAINTIFF sustained as well.

144.    After her doctor's appointment, PLAINTIFF stopped by DEFENDANT CONCRETE SAFARIS and gave DEFENDANT MAYO her doctor's letter excusing her from work.

145.    PLAINTIFF asked DEFENDANT MAYO to make a copy of the letter, or allow her to take a copy of the letter. But, DEFENDANT MAYO refused to return the original or give PLAINTIFF copy of same.

146.    DEFENDANT MAYO only allowed PLAINTIFF to take a picture of the letter, which she did.

147.    That same evening, at approximately 11:29 PM, PLAINTIFF emailed DEFENDANT SOSA, explaining that she had been injured due to DEFENDANT MAYO'S abusive work orders.

148.    PLAINTIFF also shared that she and her co-workers' believed that DEFENDANT MAYO had retaliated against her for complaining that he had subjected PLAINTIFF and other female employees to gender based discriminatory treatment.

149.    PLAINTIFF ended the email by saying "*Please contact me. I do have some questions about what happened…Mac told me all correspondence should go through JCCGCI and my supervisors [at CONCRETE SAFARIS].*"

150.    As DEFENDANTS JCCGCI and CONCRETE SAFARIS were both jointly supervising PLAINTIFF in her job duties, PLAINTIFF was told to write a report to both entities.

151.    Before PLAINTIFF submitted her email, PLAINTIFF attached the doctor's note

explaining that PLAINTIFF has "knee bursitis," needed to be at rest for one week (until 2/1), and would need an accommodation upon her return to work.

152.    PLAINTIFF decided to copy her supervisors, including Mr. Hartsfield and DEFENDANT GREEN, because her last complaint of discrimination to DEFENDANT SOSA was ignored and PLAINTIFF desperately wanted someone to finally address her concerns.

153.    Unfortunately, PLAINTIFF'S concerns were met with immediate hostility by COLLECTIVE DEFENDANTS.

154.    Specifically, on Friday, January 21, 2022, at approximately 11:19 a.m., DEFENDANT SOSA wrote PLAINTIFF an email **(hereafter "the January 21st email),** stating:

> *"Ms. Wade, please note that you may not place blame on anyone, as you are an adult, and you know your limits, and no one can force you to do anything beyond your physical capacities. **Based on our previous conversation we had (1/12/2022) prior to the meeting with Kemar at Concrete Safaris, you were demanding to be treated as an equal, you wanted to be able to do heavy lifting as well your other male colleagues** and I stated that this can bring issues to you (physical) and the site as a liability if you injure yourself and you stated you understood."*

155.    DEFENDANT SOSA also told PLAINTIFF to let her know if she would be needing a site change as an accommodation.

156.    Yet, JCCGCI DEFENDANTS had no good faith intention of offering PLAINTIFF an accommodation.

157.    Indeed, by DEFENDANT SOSA'S response, it was clear that DEFENDANT SOSA was in agreement with DEFENDANT MAYO'S retaliatory conduct and DEFENDANT SOSA did not care that PLAINTIFF complained about retaliation.

158.    Here, DEFENDANT SOSA callously blamed PLAINTIFF for wanting to be ***"treated as equal"*** and for suffering injuries for same.

159.    DEFENDANT SOSA acquiesced to and condoned the discriminatory/retaliatory treatment against PLAINTIFF.

160.  Then, on January 24, 2022, at 9:49 a.m., DEFENDANT SOSA emailed PLAINTIFF, stating: "*Good Morning, Ms. Wade.* ***Please be advised that the Concrete Safaris no longer wishes for you to return, as they are entitled to do that…Due to this site not being a good fit, I may proceed to offer you 1 last site that we may have an availability at….*"

161.  Here, DEFENDANT SOSA, acting on behalf of DEFENDANT CONCRETE SAFARIS, terminated PLAINTIFF'S employment at the site in retaliation for complaining about gender discrimination.

162.  PLAINTIFF did not notice DEFENDANT SOSA'S email when she submitted an email a minute later, at approximately 9:50 a.m., to respond to DEFENDANT SOSA'S January 21st email. Ms. Wade responded to DEFENDANT SOSA'S email, stating:

> "Dear Denis. Thank you for your response. I've had time to reflect. With all due respect, in reference to what you mentioned in your latest email to me, I am not about blame. I am about solutions and making things better. **I was requesting to be treated in a humane, equal way in the work environment when we spoke on Jan 13, 2022.  This was concerning Bruno Mayo. This included job responsibilities and how he delegated positions unfairly according to gender. Bruno did not understand how to group people of various genders and ages to get the same job done.** I have always maintained a strong work ethic and take great pride in doing excellent work. However, I do believe that no employee has to endure abuse and or be put in danger as I was…**When we complain, we are told we are the source of the problem or we have poor judgment**. Please understand, we are all here because we need the work and the money that comes from the opportunity. I am grateful to Concrete Safaris for it. **I brought the gender issue to your attention for a solution**."

163.  At approximately 1:24 p.m. that same day, PLAINTIFF sent another email confirming that she would like another assignment and asked DEFENDANT SOSA to call PLAINTIFF to discuss same.

164.  At approximately 1:27 p.m., DEFENDANT SOSA replied that she would discuss PLAINTIFF'S "second opportunity" once she had PLAINTIFF'S doctor's note confirming PLAINTIFF'S abilities to work.

165.   At approximately 1:43 p.m., PLAINTIFF replied: "I am working on getting an appointment. I am still not clear on why I was removed. Please get back to me on that. I did nothing wrong. If you are unable to get back to me, please let me know who I need to speak to…*Also how can I put in a complaint about what happened to me? Thank you for your time.*"

166.   At approximately 1:54 p.m., DEFENDANT SOSA replied:

> "Ms. Wade, **I have received all of your complaints, as has everyone in Concrete Safaris and in JCCGCI**. Please allow for me to understand, after your various complaints, **what are you expecting for there to be done?** My Director of this program is also included in this email, as is my Supervisor. I am the case manager belonging to this site and am handling this matter, therefore you should not be going to anyone else.
>
> **You've been taken out of the site <u>for your various complaints</u> and causing disruption amongst the team and the Site Staff. If you continue to insist, I will not feel comfortable placing you in any other site.**"

167.   DEFENDANT SOSA admitted that PLAINTIFF'S complaints were well known, seen by management, and that nothing would be done about same.

168.   Without any justification, DEFENDANT SOSA threatened PLAINTIFF'S employment in blatant retaliation against PLAINTIFF for voicing her complaints of gender discrimination, in violation of state and federal discrimination laws.

169.   In her email to PLAINTIFF, DEFENDANT SOSA clearly admitted that PLAINTIFF was being retaliated against in the terms and condition of her employment due to her *"various complaints."*

170.   PLAINTIFF was shocked and confused by DEFENDANT SOSA'S allegation and threat. PLAINTIFF did not understand what was the alleged "disruption" that DEFENDANT SOSA was referring to as PLAINTIFF got along well with all her co-workers and supervisors at DEFENDANT CONCRETE SAFARIS.

171. In addition, even though PLAINTIFF disagreed with how DEFENDANT MAYO treated her and her other female co-workers, PLAINTIFF always followed DEFENDANT MAYO'S orders and never received any write ups or verbal warnings concerning her work performance.

172. As such, PLAINTIFF could only draw one conclusion – this "disruption" that DEFENDANT SOSA was referring to is about PLAINTIFF voicing her complaints of discrimination.

173. Nevertheless, in effort for peace and resolution, that same day, PLAINTIFF emailed DEFENDANT SOSA back, and encouraged DEFENDANT SOSA to discuss the alleged disruption with her so she could understand how she was affecting her team.

174. Unsurprisingly, DEFENDANT SOSA did not respond to PLAINTIFF'S email at all.

175. PLAINTIFF did not hear from DEFENDANT SOSA, or anyone from DEFENDANTS JCCGCI and CONCRETE SAFARIS, until February 2, 2022, the day that marked the end of PLAINTIFF'S requested sick leave.

176. On that day, DEFENDANT SOSA wrote PLAINTIFF to follow up on whether PLAINTIFF obtained a clearance letter from her doctor for her review.

177. Unfortunately, at the time of DEFENDANT SOSA'S email, PLAINTIFF'S appointment with the Orthopedic Surgeon was still two weeks away (February 16, 2022), and so PLAINTIFF was not able to provide DEFENDANT SOSA with a useful status update.

178. On February 16, 2022, after her doctor's appointment, PLAINTIFF emailed DEFENDANT SOSA a letter from her Orthopedic Surgeon.

179. The letter stated that PLAINTIFF had been seen and treated earlier that day and he determined that PLAINTIFF could not return to work until further notice due to the

following restrictions: no prolonged sitting, standing, walking, bending, lifting, carrying, and/or overhead activities.

180. All of these acts are considered major life activities under the Americans with Disabilities Act.

181. Dr. King further advised that PLAINTIFF was pending a medical evaluation March 17, 2022, thirty days later.

182. Indeed, PLAINTIFF'S submission of her comprehensive, pages-long MRI-medical results about her injury, should have put DEFENDANT SOSA on notice that PLAINTIFF may have a disability and should engage PLAINTIFF in the interactive process with PLAINTIFF.

183. Nevertheless, acting in bad faith, DEFENDANT SOSA had no discussion with PLAINTIFF about PLAINTIFF'S rights.

184. Clearly, DEFENDANTS did not want PLAINTIFF to return to work.

185. To DEFENDANTS, PLAINTIFF was a nuisance due to her continued complaints about discrimination and retaliation at JCCGCI and CONCRETE SAFARI.

186. PLAINTIFF was subjected to and suffered discriminatory treatment solely due to her gender/sex (female).

187. At all times, DEFENDANT MAYO was acting pursuant to her authority as a supervisor/manager of DEFENDANT CONCRETE SAFARIS.

188. JCCGCI DEFENDANTS knew or should have known that DEFENDANT MAYO treated PLAINTIFF discriminatorily and subjected PLAINTIFF to a hostile work environment.

189. JCCGCI DEFENDANTS refused to address the gender discrimination or to put a stop to the gender discrimination that permeated the workplace.

190.    Instead, JCCGCI DEFENDANTS retaliated against PLAINTIFF, and allowed DEFENDANT MAYO to abuse PLAINTIFF, for making complaints about gender/sex discrimination.

191.    At all times, DEFENDANTS were acting pursuant to their authorities as managers/supervisors at DEFENDANT JCCGCI.

192.    Each DEFENDANT knew or should have known that their actions were unlawful and violated PLAINTIFF'S rights.

193.    DEFENDANTS JCCGCI and CONCRETE SAFARIS had knowledge of, and acquiesced to, gender discrimination against PLAINTIFF by their employees, managers and supervisors.

194.    JCCGCI DEFENDANTS have engaged in and continue to encourage and foster a policy and practice of gender/sex discrimination.

195.    DEFENDANTS JCCGCI and CONCRETE SAFARIS did not properly (if at all) train, instruct, or supervise DEFENDANT SOSA, DEFENDANT MAYO, or DEFENDANT GREEN in sex/gender discrimination, to PLAINTIFF'S detriment.

196.    DEFENDANTS had no good faith business justification for any of their actions against PLAINTIFF as described above.

197.    As a direct result of JCCGCI DEFENDANTS' failure to train, supervise, or instruct its managers/supervisors of the laws, PLAINTIFF was subjected to the unlawful conduct alleged herein.

198.    As a direct result of JCCGCI DEFENDANTS' discriminatory/retaliatory treatment of PLAINTIFF, PLAINTIFF suffers severe mental and emotional distress.

199.    PLAINTIFF suffers mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment

opportunities, loss of employment benefits, humiliation, stress, anxiety, embarrassment, depression, anxiety, special damages, and ongoing emotional distress.

200. JCCGCI DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

201. As such, PLAINTIFF demands Punitive Damages as against all JCCGCI DEFENDANTS, jointly and severally.

**AS A FIRST CAUSE OF ACTION**
**FOR *DISCRIMINATION* UNDER TITLE VII**
*(Against Employer DEFENDANT JCCGCI and CONCRETE SAFARIS, INC.)*

202. PLAINTIFF repeats, reiterates and realleges the foregoing allegations made in the above paragraphs of this Complaint as if more fully set forth herein at length.

203. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq*., for relief based upon the unlawful employment practices of DEFENDANT JCCGCI. PLAINTIFF complains of DEFENDANT JCCGCI'S violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex/gender.

204. DEFENDANT JCCGCI engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et seq*., by discriminating against PLAINTIFF because of her sex/gender.

205. DEFENDANTS permitted PLAINTIFF to be subjected to ongoing sex/gender-based discrimination.

206. DEFENDANTS, their agents, representatives, managers, and employees disregarded PLAINTIFF'S multiple complaints as well as their obligations as individuals, who had a duty to report and act in the face of discrimination complaints made by employees, and allowed the hostile work environment to continue and escalate against PLAINTIFF.

207. Instead, DEFENDANTS ignored PLAINTIFF'S complaints and even blamed PLAINTIFF

for the discriminatory treatment she was subjected to at the hands of DEFENDANT MAYO.

208.   When PLAINTIFF complained to management, PLAINTIFF was removed from her work site days later.

209.   DEFENDANTS condoned, supported, and ratified the discriminatory conduct of its employees.

210.   DEFENDANTS lacked any good-faith reason or business justification for taking adverse employment action against PLAINTIFF.

211.   As a result of DEFENDANTS' actions, PLAINTIFF was extremely humiliated, victimized, embarrassed, and emotionally distressed.

212.   As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, special damages, loss of benefits, inconvenience, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, fear, anger, depression, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

213.   DEFENDANTS' conduct was malicious, willful, and conducted with full knowledge of the law.

214.   PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

**AS A SECOND CAUSE OF ACTION**
**FOR *RETALIATION* UNDER TITLE VII**
***(Against Employer DEFENDANT JCCGCI and CONCRETE SAFARIS, INC.)***

215.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

216.   <u>Title VII of the Civil Rights Act of 1964</u>, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

217.   PLAINTIFF was retaliated against by DEFENDANT JCCGCI for engaging in protected activity.

218.   PLAINTIFF complained to DEFENDANT JCCGCI about the sex/gender-based discrimination she suffered from DEFENDANT MAYO.

219.   PLAINTIFF'S complaints, however, were ignored.

220.   Following PLAINTIFF'S complaints, PLAINTIFF was subjected to an adverse employment actions and other retaliatory behavior.

221.   Finally, PLAINTIFF was removed from her work site for raising concerns about discrimination and retaliation in the workplace.

222.   DEFENDANT JCCGCI had no valid business justification for the retaliatory and abusive actions taken against PLAINTIFF following Her engagement in protected activity.

223.   DEFENDANT JCCGCI placed PLAINTIFF in an uncomfortable and hostile employment position as the victim of inappropriate harassment and discrimination.

224.   As a result of JCCGCI DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

225.   As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, special damages, loss of benefits, inconvenience and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, fear, anger, depression, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

226. JCCGCI DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

227. PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

**AS A THIRD CAUSE OF ACTION FOR *DISCRIMINATION*
UNDER NEW YORK STATE EXECUTIVE LAW**

228. PLAINTIFF repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

229. New York State Executive Law §296 provides that, "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . sex . . . to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

230. JCCGCI DEFENDANTS, their agents, representatives, managers, and employees disregarded PLAINTIFF'S multiple complaints as well as their obligations as individuals, who had a duty to report and act in the face of discrimination complaints made by employees, and allowed the hostile work environment to continue and escalate against PLAINTIFF.

231. Instead, JCCGCI DEFENDANTS ignored and dismissed PLAINTIFF'S numerous complaints and requests for protection against gender-based discrimination she faced by DEFENDANT MAYO.

232. When PLAINTIFF complained to management, PLAINTIFF was removed from her work site soon thereafter.

233. JCCGCI DEFENDANTS condoned, supported, and ratified the discriminatory conduct of its employees.

234. JCCGCI DEFENDANTS lacked any good-faith reason or business justification for the

termination of PLAINTIFF.

235. As a result of JCCGCI DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

236. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, special damages, loss of benefits, inconvenience and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, fear, anger, depression, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

237. JCCGCI DEFENDANTS' conduct was malicious, willful, and conducted with full knowledge of the law.

238. PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

### AS A FOURTH CAUSE OF ACTION FOR *RETALIATION* UNDER NEW YORK STATE EXECUTIVE LAW

239. PLAINTIFF repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

240. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

241. JCCGCI DEFENDANTS engaged in an unlawful discriminatory practice by retaliating, and otherwise discriminating against PLAINTIFF because of PLAINTIFF's opposition to the unlawful employment practices of PLAINTIFF's employer.

242. PLAINTIFF was retaliated against by JCCGCI DEFENDANTS for engaging in protected activity.

243. PLAINTIFF complained to JCCGCI DEFENDANTS about the discrimination and harassment that she faced by DEFENDANT CONCRETE SAFARIS' employee, DEFENDANT MAYO.

244. PLAINTIFF complained to DEFENDANTS JCCGCI and CONCRETE SAFARIS about the sex/gender-based discrimination she suffered from DEFENDANT MAYO.

245. PLAINTIFF'S complaints, however, were ignored.

246. Following PLAINTIFF'S complaints, PLAINTIFF was subjected to an adverse employment actions and other retaliatory behavior.

247. Finally, PLAINTIFF was removed from her work site for raising concerns about discrimination and retaliation in the workplace.

248. JCCGCI DEFENDANTS have no valid business justification for the retaliatory and abusive actions taken against PLAINTIFF following Her engagement in protected activity.

249. JCCGCI DEFENDANTS placed PLAINTIFF in an uncomfortable and hostile employment position as the victim of gender-based discrimination.

250. As a result of JCCGCI DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

251. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, special damages, loss of benefits, inconvenience and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, fear, anger, depression, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

252. JCCGCI DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

253. PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

## AS A FIFTH CAUSE OF ACTION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
### (*AGAINST INDIVIDUAL DEFENDANTS SOSA, MAYO, GREEN, and MAC LEVINE*)

254.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

255.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to **aid, abet**, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

256.    INDIVIDUAL DEFENDANTS SOSA, MAYO, GREEN, and MAC LEVINE violated the section cited herein as set forth and was directly involved in the discriminatory and retaliatory actions about which PLAINTIFF complains herein.

257.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE utilized their powers, authorities, statuses, and positions to subject PLAINTIFF to the wrongful treatment outlined in this Complaint and to assist their employers in unlawful discriminatory practices against PLAINTIFF.

258.    But for DEFENDANTS' SOSA'S, MAYO'S, GREEN'S, and LEVINE'S management positions, INDIVIDUAL DEFENDANTS would not have been able or authorized to assist DEFENDANTS JCCGCI and CONCRETE SARAFIS in continuing the discriminatory treatment of PLAINTIFF.

259.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE, acting pursuant to their authorities, ignored DEFENDANT'S JCCGCI'S and CONCRETE SARAFI'S own policies, procedures, and rules (if any) regarding discriminatory behavior in the workplace.

260.    At all times, DEFENDANTS SOSA, MAYO, GREEN, and LEVINE were aware of their obligations to stop, prevent, investigate, and correct discriminatory practices against

PLAINTIFF.

261.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE, instead, perpetuated the wrongful conduct against PLAINTIFF.

262.    PLAINTIFF was treated *"less well"* by DEFENDANTS SOSA, MAYO, GREEN, and LEVINE, than [PLAINTIFF'S] similarly-situated male counterparts, due to her gender.

263.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE are individually liable for aiding and abetting the discriminatory actions of their employers, DEFENDANT'S JCCGCI and CONCRETE SARAFI.

264.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

265.    As a result of DEFENDANTS' SOSA'S, MAYO'S, GREEN'S, and LEVINE'S discriminatory treatment of PLAINTIFF, PLAINTIFF was unlawfully humiliated, degraded, and belittled, suffered a violation of his rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, humiliation, stress, anxiety, embarrassment, special damages, and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, physical injuries, physical conditions, and other non-pecuniary losses.

266.    DEFENDANTS' SOSA'S, MAYO'S, GREEN'S, and LEVINE'S action(s) are malicious, willful, outrageous, and conducted with full knowledge of the law.

267.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A SIXTH CAUSE OF ACTION FOR *DISCRIMINATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE NYC HUMAN RIGHTS LAW

268.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this complaint.

269.    The New York City Administrative Code § 8-107(1) provides that

It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

270.    JCCGCI DEFENDANTS, their agents, representatives, managers, and employees

disregarded PLAINTIFF'S multiple complaints as well as their obligations as individuals,

to report and act in the face of discrimination complaints made by employees, and allowed

the discriminatory treatment to continue and escalate against PLAINTIFF.

271.    When PLAINTIFF complained to management, PLAINTIFF was removed from her work

site soon thereafter.

272.    JCCGCI DEFENDANTS condoned, supported and ratified the discriminatory conduct of

its employees.

273.    JCCGCI DEFENDANTS lacked any good-faith reason or business justification for adverse

employment action and retaliation of PLAINTIFF.

274.    As a result of JCCGCI DEFENDANTS' actions, PLAINTIFF was extremely humiliated,

degraded, victimized, embarrassed, and emotionally distressed.

275.    As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss

of income, the loss of a salary, special damages, loss of benefits, inconvenience, and other

compensation which such employment entails, and PLAINTIFF has also suffered future

pecuniary losses, emotional pain, suffering, fear, anger, depression, inconvenience, loss of

enjoyment of life, and other non-pecuniary losses.

276.    DEFENDANTS' conduct was malicious, willful and conducted with full knowledge of the

law.

277.    PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

## AS AN SEVENTH CAUSE OF ACTION FOR *RETALIATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE NEW YORK CITY HUMAN RIGHTS LAW ("NYCHRL")

278.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this complaint.

279.    The New York City Administrative Code § 8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter. . ."

280.    PLAINTIFF was retaliated against by JCCGCI DEFENDANTS for engaging in protected

activity.

281.    PLAINTIFF complained to JCCGCI DEFENDANTS about the discrimination and

harassment that she faced by DEFENDANT CONCRETE SAFARIS' employee,

DEFENDANT MAYO.

282.    PLAINTIFF complained to DEFENDANTS JCCGCI and CONCRETE SAFARIS about

the sex/gender-based discrimination she suffered from DEFENDANT MAYO.

283.    PLAINTIFF'S complaints, however, were ignored.

284.    Following PLAINTIFF'S complaints, PLAINTIFF was subjected to an adverse

employment actions and other retaliatory behavior.

285.    Finally, PLAINTIFF was removed from her work site for raising concerns about

discrimination and retaliation in the workplace.

286.  JCCGCI DEFENDANTS have no valid business justification for the retaliatory and abusive actions taken against PLAINTIFF following her engagement in protected activity.

287.  JCCGCI DEFENDANTS placed PLAINTIFF in an uncomfortable and hostile employment position as the victim of discrimination.

288.  As a result of JCCGCI DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

289.  As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, special damages, loss of benefits, inconvenience and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, fear, anger, depression, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

290.  JCCGCI DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

291.  PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

**AS AN EIGHTH CAUSE OF ACTION DISCRIMINATION/RETALIATION INDIVIDUAL LIABILITY UNDER THE NEW YORK CITY ADMINISTRATIVE CODE NEW YORK CITY HUMAN RIGHTS LAW ("NYCHRL")**
**(*AGAINST INDIVIDUAL DEFENDANTS SOSA, MAYO, GREEN, and LEVINE*)**

292.  PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

293.  The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

294.  DEFENDANTS SOSA, MAYO, GREEN, and MAC LEVINE engaged in an unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(6) by

aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory conduct of their respective employers, against PLAINTIFF.

295. INDIVIDUAL DEFENDANTS SOSA, MAYO, GREEN, and MAC LEVINE violated the section cited herein as set forth and was directly involved in the discriminatory and retaliatory actions about which PLAINTIFF complains herein.

296. DEFENDANTS SOSA, MAYO, GREEN, and LEVINE utilized their powers, authorities, statuses, and positions to subject PLAINTIFF to the wrongful treatment outlined in this Complaint and to assist their employers in unlawful discriminatory practices against PLAINTIFF.

297. But for DEFENDANTS' SOSA'S, MAYO'S, GREEN'S, and LEVINE'S management positions, INDIVIDUAL DEFENDANTS would not have been able or authorized to assist DEFENDANTS JCCGCI and CONCRETE SARAFIS in continuing the discriminatory treatment of PLAINTIFF.

298. DEFENDANTS SOSA, MAYO, GREEN, and LEVINE, acting pursuant to their authorities, ignored DEFENDANT'S JCCGCI'S and CONCRETE SARAFI'S own policies, procedures, and rules (if any) regarding discriminatory behavior in the workplace.

299. At all times, DEFENDANTS SOSA, MAYO, GREEN, and LEVINE were aware of their obligations to stop, prevent, investigate, and correct discriminatory practices against PLAINTIFF.

300. DEFENDANTS SOSA, MAYO, GREEN, and LEVINE, instead, perpetuated the wrongful conduct against PLAINTIFF.

301. PLAINTIFF was treated *"less well"* by DEFENDANTS SOSA, MAYO, GREEN, and LEVINE, than [PLAINTIFF'S] similarly-situated male counterparts, due to her gender.

302.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE are individually liable for aiding and abetting the discriminatory actions of their employers, DEFENDANT'S JCCGCI'S and CONCRETE SARAFI'S

303.    DEFENDANTS SOSA, MAYO, GREEN, and LEVINE had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

304.    As a result of DEFENDANTS' SOSA'S, MAYO'S, GREEN'S, and LEVINE'S discriminatory treatment of PLAINTIFF, PLAINTIFF was unlawfully humiliated, degraded, and belittled, suffered a violation of his rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, humiliation, stress, anxiety, embarrassment, special damages, and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, physical injuries, physical conditions, and other non-pecuniary losses.

305.    DEFENDANTS' SOSA'S, MAYO'S, GREEN'S, and LEVINE'S action(s) are malicious, willful, outrageous, and conducted with full knowledge of the law.

306.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## JURY DEMAND

307.    PLAINTIFF requests a jury trial on all issues to be tried.

   **WHEREFORE**, PLAINTIFF respectfully requests a judgment against JCCGCI DEFENDANTS:

308.    Declaring that JCCGCI DEFENDANTS engaged in unlawful employment practices prohibited by Title VII, the NYSHRL, and the NYCHRL, in that JCCGCI DEFENDANTS discriminated against PLAINTIFF and retaliated against PLAINTIFF for complaining of unlawful discrimination.

309.   Awarding damages to PLAINTIFF for all lost wages and benefits resulting from JCCGCI

DEFENDANTS'S unlawful discrimination and retaliation and to otherwise make her

whole for any losses suffered as a result of such unlawful employment practices;

310.   Awarding PLAINTIFF compensatory damages for mental, emotional injury, distress, pain

and suffering and injury to his reputation in an amount to be proven;

311.   Awarding PLAINTIFF punitive damages;

312.   Awarding PLAINTIFF attorneys' fees, costs, and expenses incurred in the prosecution of

the action and as afforded under the above local statutes; and

313.   Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just

and proper to remedy JCCGCI DEFENDANTS' unlawful employment practices.

Dated:  New York, New York
         March 16, 2023

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By:    ___/S/_____
         Gregory Calliste, Jr.
         Alexandria Jean-Pierre
         *Attorney for Plaintiff*
         45 Broadway, Suite 430
         New York, New York 10006
         T: (212) 248 - 7431
         F: (212) 901 - 2107
         gcalliste@tpglaws.com
         ajean-pierre@tpglaws.com

EXHIBIT A

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 01/03/2023

**To:** Jaqueline Wade
c/o Phillips & Associates PLLC 45 Broadway, Suite 430
New York, NY 10006
Charge No: 520-2023-00896

EEOC Representative and email:    DONALD RAMOS
Investigator
donald.ramos@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2023-00896.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
01/03/2023

Timothy Riera
Acting District Director